**Joe L. WHITE,**
**Plaintiff-Appellee/Cross–Appellant,**

v.

**AMERICAN AIRLINES, INC.,**
**Defendant–Appellant/Cross–Appellee.**

Nos. 87–2127, 88–1421, 88–1521, 88–2309, 89–5035 and 89–5063.

United States Court of Appeals,
Tenth Circuit.

Oct. 1, 1990.

Reuben Davis (Frederic N. Schneider, III and John A. Burkhardt, were on the briefs), Tulsa, Okl., for defendant-appellant/cross-appellee.

Gary L. Richardson (Gregory G. Meier and Ronald E. Hignight, of Richardson, Meier, McKenzie & Associates, P.C., Tulsa, Okl. and Joe L. White. and Donald G. Hopkins of Collinsville, Okl., were on the briefs), for plaintiff-appellee/cross-appellant.

Before TACHA and EBEL, Circuit Judges, and SAFFELS, District Judge.*

EBEL, Circuit Judge.

These consolidated appeals relate to an action brought by plaintiff-appellant Joe L. White against defendant-appellee American Airlines, Inc. ("American"), White's former employer. White alleges, among other things, that he was discharged in retaliation for his refusal to commit perjury on behalf of American. The case was initially filed in Oklahoma state court, but subsequently was removed to the United States District Court for the Northern District of Oklahoma. A jury found that White was terminated in violation of Oklahoma's public-policy exception to the employment-at-will doctrine and awarded him $1,516,000 in damages. Because we conclude that the jury was given an erroneous instruction concerning plaintiff's burden of proof as to the motive for his discharge, we reverse and remand for a new trial.

## FACTS

White was an employee of American from 1968 until his termination on September 18, 1981. During his tenure at American, White held several supervisory, lower-level management positions. In the fall of 1978, White was assigned to a special task force to study maintenance and engineering problems concerning the DC–10 aircraft. As part of this assignment, White prepared some reports discussing the procedures American was following to change engines on the DC–10. During this time, White was promoted to shift superintendent of DC–10 aircraft maintenance, a position he held until approximately July 1979. From July 1979 until his termination, White worked as a supervisor of a Boeing 727 engine change crew.

On July 17, 1981, Darroll Davison, a Vice–President of American, met with White and informed him that his employment with American would be terminated in 60 days. American argues that White was terminated because of "an unacceptable pattern of deteriorating work performance and poor judgment." Appellant's Brief-in-Chief at 12 (Nos. 88–1421, 88–1521) (filed Oct. 27, 1988). Among other things, American alleges the following in support of its decision to terminate White: (1) in mid-March 1981, White took his crew to St. Louis to change an engine without obtaining permission from his immediate supervisor; (2) White failed to follow the union overtime list for field trips, resulting in grievances being filed against American by mechanics who should have been sent to St. Louis to perform the work and resulting in American having to pay those mechanics for the time that they would have spent in St. Louis; (3) White violated American's company policy by having his crew work more than 30 straight hours; (4) White violated FAA regulations by having a mechanic inspect his own work; (5) on June 24, 1981, White permitted an aircraft, on which his crew was performing an engine change, to leave the Tulsa Base without completing the engine change; (6) on Saturday, June 26, 1981, White, refused to report for weekend duty; (7) other supervisors complained that White was neglecting his responsibilities, that he was frequently absent from the premises during his shift, and that White's crew left work early; (8) White's immediate supervisor and another American employee made a total of twenty-two spot checks during White's shift and only found White at work during one of those checks; (9) White listed eight hours of overtime on his timecard that he did not in fact work; and (10) White induced his crew to work overtime by promising them that they would be paid for more hours than they actually worked. *Id.* at 6–9.

White alleges that he was in fact fired because he refused to perjure himself, as requested by David E. Wheeler, American's outside counsel in litigation concerning the May 1979 crash of an American DC–10 in Chicago. White had been served with notice to appear for a deposition in the case,

---

* The Honorable Dale E. Saffels, of the United States District Court for the District of Kansas, sitting by designation.

and he met with Wheeler several times over a three-day period in April or May of 1981 to prepare for the deposition. No one else was present at the meetings.

During the first day of their meetings, White and Wheeler allegedly discussed an engine removal procedure that American had followed involving the use of a hyster forklift. White initially testified that Wheeler told him not to mention the removal procedure at his deposition. R.Vol. IV at 223–29. However, White subsequently stated that Wheeler in fact had only asked him not to volunteer any information. R.Vol. IV at 230, 234–35.

White testified that on the second day of their meetings, White and Wheeler discussed: (1) a May 1, 1979 memorandum written by White requesting that maintenance be performed on the hyster forklift; (2) a "request for engineering evaluation" allegedly filed by White relating to the use of the hyster forklift to perform the engine removal process; and (3) an incident in 1979 in which White had a structural engineer examine the wing of a DC–10 as part of his complaints about the engine removal procedure. R.Vol. IV at 235–245. White testified that Wheeler told him not to remember any of this, but that White refused. R.Vol. IV at 247–48.

White never testified, by deposition or otherwise, in the DC–10 litigation. Wheeler denied that he asked White to testify falsely or that he told White to forget what he knew about the DC–10 or any other matter. White never notified anyone at American of Wheeler's alleged attempt to have White commit perjury.

On or about July 7, 1982, White filed his first suit against American in Oklahoma state court ("White I"). American removed the case to the United States District Court for the Northern District of Oklahoma, and on August 27, 1982, White filed an amended complaint alleging five causes of action: (1) breach of contract; (2) retaliatory discharge; (3) violation of 42 U.S.C. § 1983; (4) defamation; and (5) conspiracy.

On September 27, 1982, American filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). The district court dismissed all of White's claims except the defamation claim on January 4, 1984. On June 9, 1986, White filed a motion to vacate the district court's January 4, 1984 order. In ruling on that motion on October 10, 1986, the court concluded that White had stated a contractual claim for breach of an implied covenant of good faith pursuant to *Hall v. Farmers Ins. Exchange*, 713 P.2d 1027 (Okl.1985), and to that extent vacated its January 4, 1984 order and reinstated White's claim for breach of contract. On November 19, 1986, the court denied a motion filed by American requesting summary judgment on the defamation claim.

On July 16, 1984, White filed a second suit in Oklahoma state court ("White II"), alleging a conspiracy to wrongfully terminate him and to defame him and a conspiracy to destroy and falsify evidence. Plaintiff named American and several individual employees and other agents of American as defendants. American removed *White II* to the United States District Court for the Northern District of Oklahoma. On April 30, 1986, the district court granted American's motion for summary judgment in *White II*, concluding that: (1) a corporation cannot conspire with itself as a matter of law, and the individual agents were not alleged to have acted outside the scope of their employment; (2) the underlying tort claims for wrongful termination and defamation should be dismissed as a matter of law for the same reasons set forth by the district court in its January 4, 1984 order dismissing those same claims in *White I*; and (3) *White II* was merely an attempt to circumvent the court's rulings in *White I*, including a ruling that had prohibited plaintiff from naming additional defendants in *White I*.

On January 6, 1987, this court affirmed the district court's April 30, 1986 order dismissing *White II*. On September 15, 1987, the district court again partially vacated its January 4, 1984 order in *White I*, as well as its October 10, 1986 order in *White I*, and concluded that because of the Oklahoma Supreme Court's subsequent decision in *Hinson v. Cameron*, 742 P.2d 549

(Okl.1987), White could not maintain a contract claim under *Hall v. Farmers Ins. Exchange* for breach of an implied covenant of good faith. However, the court also concluded after reviewing the *Hinson* opinion that, although the Oklahoma Supreme Court had not yet done so, Oklahoma would adopt as part of its tort law a public policy exception to its employment-at-will doctrine. Therefore, the court reinstated White's wrongful discharge tort claim in *White I.*

Six days later, on September 21, 1987, the district court denied American's request for a continuance. On September 23, 1987, the trial of both the retaliatory discharge claim and the defamation claim began. On October 13, 1987, the jury returned a verdict in favor of White on his retaliatory discharge claim and awarded White $1,516,000 in damages. The jury returned a verdict in favor of American on the defamation claim. On March 9, 1988, the district court denied American's motion for a partial judgment n.o.v. or, alternatively, for a new trial or order of remittitur. American appeals that decision.

At the time this appeal was filed, the Oklahoma Supreme Court had not yet announced its decision in *Burk v. K–Mart,* 770 P.2d 24 (Okl.1989), which recognized, under Oklahoma tort law, a public policy exception to Oklahoma's employment-at-will doctrine. The Oklahoma Supreme Court subsequently has held that the public policy exception announced in *Burk* is to be applied retroactively. *McGehee v. Florafax Int'l, Inc.,* 776 P.2d 852 (Okl.1989).

### DISCUSSION

I. No. 88–1421

A. *Motive*

The jury was given the following instruction concerning plaintiff's burden of proof

as to American's motive for discharging White:

> The essential element of plaintiff's claim, which plaintiff must establish by a preponderance of the evidence, is that his (plaintiff's) employment was terminated by defendant because plaintiff refused to commit perjury.

> If you find by a preponderance of the evidence that the plaintiff was discharged by defendant because of his refusal to commit perjury, then your verdict should be for the plaintiff *even if defendant may have had a legitimate reason for discharge.*

> However, if plaintiff fails to so prove by the required degree of proof, then your verdict should be for the defendant; and this would be true irrespective of any other motivation or acts of the defendant.

R.Doc. 339 at 8 (emphasis added). *See also* R.Vol. XIV at 1759. Under this instruction, American could have prevailed only if the jury failed to find that White's alleged refusal to commit perjury was a factor in the decision to discharge him. American argues that the district court erred in failing to instruct the jury that in order for White to prevail, the refusal to commit perjury must have been a substantial factor, perhaps even the sole factor, in the decision to terminate him.

As a threshold matter, we must evaluate plaintiff's assertion that American waived that argument because it failed properly to object to the motive instruction in the district court. During the conference held to discuss the district judge's proposed jury instructions, one of American's attorneys specifically objected to the motive instruction on the ground that it would permit White to prevail even if he was fired for legitimate reasons. *See* R.Vol. XIII at 1672.[1] Therefore, American adequately

---

1. These remarks were followed by a somewhat confusing interaction between the district judge and American's attorneys. The complete interchange, including the initial objection, was as follows:

 MR. SCHNEIDER: We would object to the motive instruction again. It references an incorrect burden of proof the Court has ruled

on. In addition, we're troubled by the second paragraph [of the instruction] where the Court instructs that if you find by a preponderance of the evidence that the plaintiff was discharged by defendant because of his refusal to commit perjury, then your verdict should be for the plaintiff even if defendant may have had a legitimate reason for dis-

preserved its objection.[2]

 We turn now to determine the merits of American's objection to the motive instruction. In deciding a challenge to jury instructions, an appellate court is to "review the record as a whole to determine whether the instructions 'state the law which governs and provided the jury with an ample understanding of the issues and the standards applicable.'" *Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1271 (10th Cir.1988) (quoting *Ramsey v. Culpepper*, 738 F.2d 1092, 1098 (10th Cir.1984)). The appellate court must "consider all that the jury heard and, from [the] standpoint of the jury, decide not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had [an] understanding of the issues and its duty to determine these issues." *Id.* (quoting *Durflinger v. Artiles*, 727 F.2d 888, 895 (10th Cir. 1984)).

 We conclude that the district court failed to provide the jury with an ample understanding of the governing law.[3] We have not found any Oklahoma cases that consider specifically whether, in order to fall within the public policy exception to the employment-at-will doctrine, a discharge must be significantly motivated by the refusal to violate an established public policy, or whether it is sufficient to prove merely that the refusal was at least one motivation for the discharge. However, the Oklahoma courts have held that in order to prove a claim under two analogous statutory provisions (which prohibit retaliatory discharge in specifically enumerated contexts), a discharge must be "significant[ly]" motivated by an employee's attempt to engage in conduct protected by those statutes. *Buckner v. General Motors Corp.*, 760 P.2d 803, 806–07, 810 (Okl.1988) (adopting the proof rules applicable to Title VII disparate treatment claims for retaliatory discharge claims brought under Oklahoma workmen's compensation statute, Okla.Stat.Ann. tit. 85, § 5; also noting that "if retaliatory motivations comprise a significant factor in a[n] employer's decision to terminate an employee, even though other legitimate reasons exist to justify the termination, the discharge violates the intent of § 5"); *Thompson v. Medley Material Handling, Inc.*, 732 P.2d 461, 463 (Okl.1987) ("We hold that when retaliatory motivations comprise a significant factor in an employer's decision to terminate an employee, even though other

charge. I don't think that is a proper statement of the law.

THE COURT: Well, it better be or there is no cause of action at all and I know what your argument is. If an employee at will can be fired for his refusal to commit a crime because he was an employee at will. That's your argument.

MR. SCHNEIDER: I don't—I didn't intend to create that impression. Argument would be that if Joe White was fired for—was found to have cheated on his time card or neglected his duties as an employee, then the company could let him go then and that is a different reason.

THE COURT: As long as he also was let go because he did not commit perjury, absolutely.

MR. DAVIS: I agree.

THE COURT: That's all I'm saying. Any other reason is perfectly legitimate. All I'm saying is you can't use that—

MR. DAVIS: I agree with that, Your Honor. R.Vol. XIII at 1672–73.

**2.** Moreover, American made a general request, at the end of the instructions conference, that its own proposed instructions be adopted. Ameri-can's "Second Supplemental Set of Jury Instructions" provided that an essential element of plaintiff's wrongful discharge claim was "[t]hat the officer or employee of the defendant who decided to terminate the plaintiff's employment did so, in fact, because plaintiff refused to commit perjury." R.Doc. 335, at 2. This proposed instruction differs from the instruction actually given to the jury in two important ways: (1) the proposed instruction stresses that plaintiff's discharge must "in fact" have been caused by the refusal to commit perjury; and (2) the proposed instruction does not state that if plaintiff was discharged because of his refusal to commit perjury, he would be entitled to prevail "even if defendant may have had a legitimate reason for discharge."

**3.** The views of the resident district judge are entitled to "some deference." *Phico Ins. Co. v. Providers Ins. Co.*, 888 F.2d 663, 665 (10th Cir. 1989). However, even after according deference to the district court's interpretation of Oklahoma law, we are left with the conviction that the instruction as given does not adequately reflect the law that would be followed by the Oklahoma Supreme Court on this issue.

legitimate reasons exist to justify the termination, the discharge violates the intent of [Okla.Stat.Ann. tit. 85,] section 5"); *Hall v. O'Keefe*, 617 P.2d 196, 201 (Okl.1980) ("To establish a claim that the discharge of an officer by a corporate authority violates section 51–102(6) of the Fire and Police Arbitration Act, the officer must show that his involvement in the activities protected by the Act was a substantial motivating factor in the decision to terminate his employment."); *Bostwick v. Atlas Iron Masters, Inc.*, 780 P.2d 1184, 1188 (Okl.Ct.App. 1988) (in order to prove retaliatory discharge under workmen's compensation statute, plaintiff must prove "that retaliatory motivations comprised a significant factor in" the decision to discharge him).

We see no basis for distinguishing the common law tort claim at issue here from the statutory retaliatory discharge provisions at issue in the above-cited cases. Therefore, we conclude that the district court committed reversible error by failing to instruct the jury that American should be held liable only if White's termination was significantly motivated by White's refusal to commit perjury. Accordingly, we remand the case for a new trial.

We address below certain of the other issues raised in these appeals. In light of our decision to grant a new trial because of the deficient motive instructions, we do not need to resolve the issues raised by American that merely present alternative grounds for a new trial. However, we address some of those issues because they are likely to reappear during the trial on remand. We do not address the following issues because it is unnecessary to resolve them and they are less likely to recur: (1) the sufficiency of evidence to support the jury verdict; (2) American's argument that the district court improperly refused to grant American's request for a continuance; (3) American's argument that several of the district court's evidentiary rulings were erroneous; (4) the sufficiency of evidence to support the damages claim; and (5) whether plaintiff is entitled to recover damages for emotional distress.[4]

## B. *Burden of Proof*

■ American argues that the district court erred in instructing the jury that plaintiff only had to prove his retaliatory discharge claim by a preponderance of the evidence. Instead, American argues that plaintiff should have been required to prove his claim by clear and convincing evidence.

We have found no Oklahoma cases considering whether a preponderance standard applies in an action involving the public policy exception to the employment-at-will doctrine. However, here we cannot conclude that the district court's decision to use the preponderance standard is unreasonable. It is true that the clear and convincing evidence standard applies to certain fraud claims, *see, e.g., Funnell v. Jones*, 737 P.2d 105, 108 (Okl.), *cert. denied*, 484 U.S. 853, 108 S.Ct. 158, 98 L.Ed.2d 113 (1987), and to other "areas of the law, where a need for great certainty is required." *Oklahoma Uniform Jury Instructions–Civil*, § 3.2, at 25 (1982).[5]

4. However, we note that if it were necessary to consider the sufficiency of evidence supporting the damages award, we would find it a troubling issue to resolve. Our review of the record uncovered little evidence to support what appears to be a substantial award for emotional harm. Although the jury did not detail the component parts of its $1,516,000 damages award, plaintiff's expert witness on damages testified that plaintiff's lost future earnings totaled $1,045,538. R.Vol. VII at 680. Therefore, at least $470,462 of the award appears to be attributable to the alleged emotional harm suffered by plaintiff as a result of his termination.

In addition, the damages award may have included payment for 29 years of future wages and benefits that plaintiff allegedly would have earned had he remained as an employee of American until retirement age. We note that although damages under Oklahoma tort law are measured by "the amount which will compensate for all detriment proximately caused [by the wrong], whether it could have been anticipated or not," Okla.Stat.Ann. tit. 23, § 61, damages for future losses nevertheless must be "certain." Okla.Stat.Ann. tit. 23, § 5. It is not clear whether White established with the requisite "certain[ty]" that he would have remained at American until he reached retirement age.

5. A heightened evidentiary standard must also be met in order to prove a violation of a statute. *See Rotramel v. Public Service Co.*, 546 P.2d 1015, 1017 (Okl.1976) (requiring "competent and substantial evidence").

However, in light of the fact that the preponderance standard applies "in most civil cases" in Oklahoma, *Oklahoma Uniform Jury Instructions—Civil,* § 3.2, at 25 (1982), we cannot conclude that the district court acted unreasonably in applying that standard to the wrongful discharge claim in this case.

### C. *Nexus Requirement*

■ American also argues that the district court erred in failing to require plaintiff to prove the existence of a nexus between American's conduct and Wheeler's alleged request that plaintiff commit perjury. American appears to raise two separate arguments in this regard: (1) the district court erred in admitting plaintiff's testimony concerning Wheeler's alleged attempt to suborn perjury; and (2) the district court erred in failing to instruct the jury that plaintiff was required to prove a nexus between American's conduct and Wheeler's request that plaintiff commit perjury. As to the first issue, American has failed to demonstrate that the district court abused its discretion in admitting plaintiff's testimony concerning his interview with Wheeler. The testimony was clearly relevant to plaintiff's claim of wrongful discharge, since plaintiff claimed that he was terminated because of his refusal to commit perjury. American has not demonstrated that any prejudice which may have resulted from admitting the testimony outweighed the testimony's probative value to a sufficient extent for us to conclude that the district court abused its discretion.

■ Concerning the second issue, we believe that the instructions given to the jury required a sufficient link between American's conduct and the perjury request. The jury was instructed that among the essential elements of the wrongful discharge claim were that: (1) plaintiff was requested to commit perjury; (2) plaintiff refused to commit perjury and defendant knew of plaintiff's refusal; and (3) plaintiff was terminated because of his refusal to commit perjury. *See* R.Doc. 339 at 7. Thus, in order to find American liable, the jury had to conclude that American knew about White's refusal to commit perjury and terminated his employment because of that refusal. We do not see why any greater connection between American's conduct and the perjury request should be required.

### D. *Knowledge Requirement*

■ American argues that the district court erred in failing to instruct the jury that White must prove that the employee of American who terminated White knew of White's refusal to testify falsely. As noted above, the court instructed the jury that an essential element of plaintiff's wrongful discharge claim was that "plaintiff refused to commit perjury and defendant knew of such refusal." R.Doc. 339 at 7.

American argues that the court's instruction might have misled the jury into thinking that the knowledge of American, the corporate entity, was all that was required rather than the knowledge of the person at American who actually terminated White's employment. However, this ambiguity was eliminated by the district court's instructions on causation. The causation instructions provided that an essential element of the wrongful discharge claim is that "[t]he defendant terminated plaintiff's employment because plaintiff refused to commit perjury." R.Doc. 339 at 7, 8. Plaintiff could have been terminated "because" of his refusal to commit perjury only if the American officials responsible for his termination were in fact aware that he refused to commit perjury. Therefore, the lack of specificity in the knowledge instruction is not problematic.

### E. *Damages Instruction*

■ American further argues that the district court erred in failing to instruct the jury either that it could not award damages for loss of future wages or benefits or that White must prove such damages to a reasonable certainty. The district court recited the following instructions to the jury:

Damages—Wrongful Discharge

If you find from a preponderance of the evidence and under these instructions that the defendant discharged plaintiff because he refused to commit perjury and you find that plaintiff Joe L. White has sustained and is entitled to damages as a result of the discharge, then you may assess damages *in such amount as you find has been established by a reasonable certainty to be the sum needed to fairly and reasonably compensate plaintiff for any loss of income and benefits that he has suffered as a result of defendant's termination of his employment.*

In this regard, if you find in favor of the plaintiff, then you may award to plaintiff the loss of income and benefits he sustained, if any, by reason of that termination, less the amount of income plaintiff has earned working elsewhere, and less the income plaintiff could have earned elsewhere if he had used reasonable diligence in attempting to obtain work.

. . . .

Mathematical exactness is not required, but *the amount established must be within reasonable probabilities and not the product of conjecture or speculation.*

. . . .

Damages—Reasonable—Not Speculative

Damages must be reasonable. If you should find that the plaintiff is entitled to a verdict, you may award him only such damages as will reasonably compensate him for such injury and damage as you find, from a preponderance of the evidence in the case, that he has sustained as a proximate result of the occurrences, or you may award nominal damages.

R.Doc. 339 at 15, 23 (emphasis added).

American appears to be arguing, as it argued in the district court in a post-trial motion, that the jury should have been instructed that an essential element of plaintiff's wrongful discharge claim was that it be reasonably certain plaintiff would have continued working for American if he had not been terminated. Assuming, ar-

guendo, that American is correct, we agree with the district court that defendant's requested instruction would have been largely redundant because the instructions quoted above required that the damages award not be the product of speculation. *See* Dist.Ct.Order at 23 (March 9, 1988). It was unnecessary for the jury to receive more explicit guidance on this issue.

**F. *Attorney–Client Privilege***

American argues that the district court erred in concluding that the attorney-client privilege does not apply to testimony concerning the meeting between plaintiff and Wheeler. Under Oklahoma law, "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client." Okla.Stat.Ann. tit. 12, § 2502(B). Oklahoma law further provides, under the so-called "crime-fraud" exception, that the attorney-client privilege does not extend to situations in which "the services of the attorney were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud." Okla. Stat.Ann. tit. 12, § 2502(D)(1).

The district court concluded that "the critical aspect of the conversation" between plaintiff and Wheeler (i.e., the alleged request by Wheeler that plaintiff commit perjury) was not " 'made for the purpose of facilitating the rendering of professional legal services' " and thus, under both Okla. Stat.Ann. tit. 12, § 2502(D)(1) and *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 354, 105 S.Ct. 1986, 1993, 85 L.Ed.2d 372 (1985), such a communication was not covered by the attorney-client privilege. Dist.Ct.Order at 16 (March 9, 1988).

American argues that the meetings between White and Wheeler were held in order to prepare White for his upcoming deposition in the DC–10 crash litigation and therefore were conducted "to facilitate 'the rendition of professional legal services.' " Appellant's Brief-in-Chief at 37 (Nos. 88–

1421, 88–1521) (October 27, 1988) (quoting Okla.Stat.Ann. tit. 12, § 2502(B)). We agree with American. However, the attorney-client privilege would not apply if the crime-fraud exception is triggered.

American argues that in order for White to take advantage of the crime-fraud exception, White should have been required to prove that American was part of the alleged effort of Wheeler, its outside counsel, to have White commit perjury. American also argues that White should have been required to prove that the exception is applicable by using evidence that is not itself otherwise covered by the attorney-client privilege. In particular, American contends that it was error to permit White to rely solely on his self-serving testimony that Wheeler in fact told him to commit perjury.

We have not found any Oklahoma cases discussing whether the party seeking disclosure must make out some type of heightened showing that § 2502(D)(1) applies or whether the party must introduce evidence that is independent of the privileged information at issue. In a civil case based upon a state cause of action, state law controls the determination of privileges. Fed.Rule of Evid. 501. However, the United States Supreme Court has held that, for purposes of federal law, independent evidence is not required in order to invoke the crime-fraud exception. *United States v. Zolin*, —— U.S. ——, 109 S.Ct. 2619, 2632, 105 L.Ed.2d 469 (1989). We have no reason to believe that Oklahoma law would differ in this respect.

It appears that some type of prima facie showing of a crime or fraud is required under Oklahoma law in order to trigger the applicability of the crime-fraud exception. *See Keller v. State*, 651 P.2d 1339, 1342 (Okl.Crim.App.1982). Although the precise nature of the required prima facie showing is uncertain, we believe that White's allegations, which contend that Wheeler re-

peatedly asked him to commit perjury and that Wheeler periodically met briefly with Massielo (an American Vice–President) just prior to making a number of these requests, constitute sufficiently probative evidence to trigger the crime-fraud exception. Therefore, we believe that the conversations between plaintiff and Wheeler concerning Wheeler's alleged request that plaintiff commit perjury fall within the crime-fraud exception to the attorney-client privilege.[6]

### G. *Res Judicata*

American argues that the April 30, 1986 order dismissing the retaliatory discharge claim, and all other claims, brought in *White II* (civil action number 84–C–716–C) precluded White's retaliatory discharge claim in this case.[7] However, because American did not raise the res judicata defense in the district court until almost one year after judgment was entered,[8] we conclude that American has waived that defense. American could not have raised the defense in its pleadings, as is ordinarily required under Fed.R.Civ.P. 8(c), because at the time that *White II* was decided, all of the counts alleged in the amended complaint (except the defamation count) had been dismissed pursuant to Fed.R.Civ.P. 12(b)(6). But American could have raised the res judicata defense prior to the time that trial began. Although American argues that it failed to raise the issue as a direct result of the district court's refusal to grant its continuance request, American had over a week between the time that the wrongful discharge claim in *White I* was reinstated and the time that the trial in *White I* began. This constituted sufficient time for American to identify and raise the issue. Therefore, we conclude that American has waived the defense, and we decline to consider it.

---

**6.** Because of our conclusion that the crime-fraud exception applies, we need not address American's argument that White did not have the power to waive American's attorney-client privilege.

**7.** The April 30, 1986 order was affirmed by this court in *White v. American Airlines, Inc.*, No. 86–1828 (10th Cir. Jan. 6, 1987) (unpublished order and judgment).

**8.** *See* Section III, *infra*.

## II. No. 88–1521

Plaintiff filed a cross-appeal from the district court's decision refusing to award him attorney's fees under Okla.Stat.Ann. tit. 12, § 936 as the prevailing party, refusing to award him prejudgment interest, and imposing a postjudgment rate of interest under 28 U.S.C. § 1961, rather than a postjudgment rate under Oklahoma law. At oral argument, plaintiff abandoned his argument concerning postjudgment interest. Because we are reversing and remanding this matter, plaintiff is not a prevailing party, and he is not entitled to attorney's fees or to any interest, prejudgment or postjudgment. Therefore, we affirm the district court's denial of attorney's fees and prejudgment interest, and we vacate the award of postjudgment interest.

## III. No. 89–5035

 American appeals from the district court's denial of its November 14, 1988 motion, filed pursuant to Fed.R.Civ.P. 60(b)(1), to vacate the November 19, 1987 judgment entered against American on plaintiff's wrongful discharge claim. American argues that the wrongful discharge claim was barred under the doctrine of res judicata because of the judgment entered against plaintiff on April 30, 1986 in case number 84–C–716 (which this court affirmed on January 6, 1987, in case number 86–1828). We review the denial of a motion filed pursuant to Fed.R.Civ.P. 60(b) only to determine whether the district court abused its discretion. *See Browder v. Director, Dep't of Corrections*, 434 U.S. 257, 263 n. 7, 98 S.Ct. 556, 560 n. 7, 54 L.Ed.2d 521 (1978); *Republic Resources Corp. v. ISI Petroleum West Caddo Drilling Program*, 836 F.2d 462, 465 (10th Cir. 1987); *Cessna Finance Corp. v. Bielenberg Masonry Contracting, Inc.*, 715 F.2d 1442, 1445 (10th Cir.1983).

A motion for relief under Rule 60(b)(1) must be filed "within a reasonable time," and, in any event, "not more than one year after the judgment ... was entered." Fed. R.Civ.P. 60(b). A motion is not timely merely because it has been filed within one year of the judgment. *See Security Mut.*

*Casualty Co. v. Century Causalty Co.*, 621 F.2d 1062, 1068 (10th Cir.1980) (motion under Rule 60(b)(1) was untimely because there was an unexplained delay of 115 days between the date of the judgment and the date that the motion was filed). Here, the judgment was entered on November 19, 1987, and the Rule 60(b)(1) motion was filed on November 14, 1988. Although the motion was filed within the one-year time limit, the district court concluded that the motion was untimely because it was not filed within a reasonable time.

American has not sufficiently justified the delay in filing its Rule 60(b)(1) motion. American argues that because the trial began just eight days after the retaliatory discharge claim was reinstated, it did not have enough time to determine whether a res judicata defense was available. Appellant's Reply Br. at 4 (No. 89–5035). We have already concluded that American was given sufficient time to raise its res judicata defense at trial. However, even if American did not have sufficient time to raise the defense during the trial, American did not file its Rule 60(b)(1) motion until almost one year after the judgment was entered. American has not offered sufficient justification for this delay, and therefore we cannot conclude that the district court abused its discretion in denying the motion.

## IV. No. 88–2309

American appeals the denial of its motion to review the district court clerk's decision to tax American with costs in the amount of $1,902.03. Our review is limited to determining whether the district court abused its discretion in denying the motion. *See Furr v. AT & T Technologies, Inc.*, 824 F.2d 1537, 1550 (10th Cir.1987); *Ramos v. Lamm*, 713 F.2d 546, 560 (10th Cir.1983). However, in light of our conclusion that a new trial is required, we vacate the district court's award of costs because plaintiff is not a "prevailing party" within the meaning of Fed.R.Civ.P. 54(d) and therefore is not entitled to costs.

## V. No. 89–5063

On January 28, 1985, plaintiff filed a motion for a protective order concerning tape recordings made during a July 17, 1981 meeting between plaintiff, Darroll Davison, and O.J. Gilbert (the Director of Supply Services at American's Tulsa, Oklahoma Base) concerning plaintiff's discharge. The motion and an attached letter alleged that the tape recordings had been altered. Hearings were held on this motion before a United States Magistrate on May 23–25, 1985. Plaintiffs also initiated two collateral proceedings concerning the tape-alteration issue in Oklahoma state court.

American argued that the tape-alteration allegation was unfounded and therefore requested sanctions. On April 30, 1986, the district court granted American's request for sanctions, but reserved for a later time the determination of the precise amount of sanctions that were warranted. On March 15, 1989, the district court awarded sanctions in the amount of $7,362.15, which included the $6,528.75 of attorney's fees and the $833.40 of costs incurred in connection with the May 23, 24, and 25, 1985 hearings.

We may reverse an award of sanctions only if the district court abused its discretion. *Adamson v. Bowen*, 855 F.2d 668, 672–73 (10th Cir.1988). American argues that the district court abused its discretion when it awarded American only those attorney's fees and expenses incurred in connection with the hearings held on May 23–25, 1985, and not for the time spent preparing for the hearings (including time spent conducting discovery) or for the time spent litigating the collateral proceedings in state court. However, the district court determined that the amount awarded "strikes an appropriate balance" because there was no evidence that plaintiff's tape-alteration allegation was made with "fraudulent intent." March 15, 1989 Dist.Ct.Order at 5. We cannot conclude that the district court abused its discretion in making this reduced award.

■ American also argues that the district court abused its discretion when it refused to award sanctions against Donald G. Hopkins, plaintiff's attorney at the time the January 28, 1985 motion for a protective order was filed. Plaintiff signed the January 28, 1985 motion; Hopkins' name appeared only in typewritten form.

American argues that it is entitled to sanctions against Hopkins under Fed.R. Civ.P. 11 because "Hopkins' name appeared on each of the papers filed in the tape matter and he took the lead at the May 23–25, 1985 hearing." Appellants' Reply Br. at 4 (No. 89–5063). The district court refused to award sanctions against Hopkins, noting that Rule 11 only "focuses on the individual who *signs* the document in question." Dist.Ct.Order at 6 (March 15, 1989) (emphasis in original).[9] We agree with the district court. *See* C. Wright & A.

---

**9.** Rule 11 provides, in relevant part:

Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, whose address shall be stated. A party who is not represented by an attorney shall sign the party's pleading, motion, or other paper and state the party's address.... The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.
Fed.R.Civ.P. 11.

Apparently because plaintiff is himself a lawyer, American has not argued that Hopkins, as an "attorney of record," was required to sign the pleading under Fed.R.Civ.P. 11. *See* Fed.R. Civ.P. 11.

Miller, *Federal Practice and Procedure* § 1331, at 497–98 (1969) (noting that "[a] typewritten name ... is not sufficient" to satisfy Rule 11); *cf. Pavelic & LeFlore v. Marvel Entertainment Group,* —— U.S. ——, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989) (where individual attorney signs frivolous pleading on behalf of his law firm, the name of which appears in the pleading in typewritten form, sanctions may be imposed only against the individual signer, not against the law firm generally); *Robinson v. National Cash Register Co.,* 808 F.2d 1119, 1131 (5th Cir.1987) (refusing to award sanctions against attorney whose name appeared on pleading only as part of typewritten name of law firm and who did not sign pleading), *overruled in part on other grounds, Thomas v. Capital Security Services, Inc.,* 836 F.2d 866 (5th Cir. 1988) (en banc).

■■■ American further argues that sanctions against Hopkins are justified under 28 U.S.C. § 1927.[10] Unlike Rule 11, § 1927 does not by its terms apply only to the actual signer of the frivolous document. However, an award should be made under § 1927 "only in instances evidencing a 'serious and standard disregard for the orderly process of justice.' " *Dreiling v. Peugeot Motors of America, Inc.,* 768 F.2d 1159, 1165 (10th Cir.1985) (quoting *Kiefel v. Las Vegas Hacienda, Inc.,* 404 F.2d 1163, 1167 (7th Cir.1968), *cert. denied,* 395 U.S. 908, 89 S.Ct. 1750, 23 L.Ed.2d 221 (1969)). *See also Braley v. Campbell,* 832 F.2d 1504, 1512 (10th Cir.1987) (en banc) (sanctions are appropriate under § 1927 "for conduct that, viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court"). American has not demonstrated that Hopkins' conduct satisfied this ex-

treme standard.[11] Therefore, we cannot conclude that the district court abused its discretion in failing to award sanctions against Hopkins.

## VI. No. 87–2127

■■■ American also appeals from the district court's June 30, 1987 minute order denying American's motion for attorney's fees as a sanction against plaintiff for initiating *White II,* which raised claims substantially identical to some of the claims raised in *White I.* The primary difference between the two actions was that in *White I,* American was the only named defendant, while in *White II* various individuals as well as American were named defendants. The complaint in *White II* was filed after the district court refused to permit plaintiff to add any individuals as defendants in *White I.* American argues that sanctions are appropriate under Fed.R.Civ.P. 11, 28 U.S.C. § 1927, and the court's inherent authority. We cannot conclude that the district court abused its discretion in denying American's motion. Therefore, we affirm the June 30, 1987 minute order.

## CONCLUSION

We REVERSE the March 9, 1988 order of the district court denying American's motion for a new trial, and we REMAND the case for further proceedings consistent with this opinion. We AFFIRM the district court's denial of attorney's fees to plaintiff, and we VACATE the district court's award of costs and postjudgment interest to plaintiff as a prevailing party. We AFFIRM the district court's denial of American's Rule 60(b)(1) motion to vacate the November 19, 1987 judgment entered against

---

10. Section 1927 provides, in relevant part:
 Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.
 28 U.S.C. § 1927.

11. American similarly has failed to demonstrate that the district court abused its discretion in declining to exercise its inherent authority to

award attorney's fees against a party who "has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622–23, 44 L.Ed.2d 141 (1975) (quoting *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)). *See also Roadway Express, Inc. v. Piper,* 447 U.S. 752, 765–66, 100 S.Ct. 2455, 2463–64, 65 L.Ed.2d 488 (1980).

American on plaintiff's wrongful discharge claim. We AFFIRM the district court's March 15, 1989 order awarding sanctions to American in the amount of $7,362.15.